**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**NICOLE HUSHLA,**

       **Plaintiff,**       **6:22-cv-06039**

   **-against-**        **FIRST AMENDED**
              **COMPLAINT**
**THE CITY OF ROCHESTER, a municipal entity,**
**"JOHN DOE POLICE OFFICERS 1-200" (names**
**and number of whom are unknown at present),** **JURY DEMAND**
**TODD BAXTER, "RICHARD ROE SHERIFF'S**
**DEPUTIES 1-200" (names and number of whom are**
**unknown at present), and other unidentified**
**members of the Rochester Police Department and**
**Monroe County Sheriff's Office,**

       **Defendants.**

-----------------------------------------------------------------X

   Plaintiff amends the caption to read as follows:

-----------------------------------------------------------------X

**NICOLE HUSHLA,**

       **Plaintiff,**

   **-against-**

**THE CITY OF ROCHESTER, a municipal entity,**
**"JOHN DOE POLICE OFFICERS 1-200" (names**
**and number of whom are unknown at present),**
**TODD BAXTER, in his official capacity as Monroe**
**County Sheriff,, and "RICHARD ROE SHERIFF'S**
**DEPUTIES 1-200" (names and number of whom are**
**unknown at present),**

       **Defendants.**

-----------------------------------------------------------------X

Plaintiff voluntarily dismisses her claim against Todd Baxter individually,

Plaintiff, by her undersigned attorneys alleges as follows, as and for her First Amended

Complaint

## PRELIMINARY STATEMENT

1.       Nicole Hushla Re ("Ms. Hushla") brings this action to remedy the physical and

emotional injuries inflicted upon her caused first by being a victim of unnecessary use of force

while at  demonstrations on September 4, 2020 and September 5, 2020, and then later on

September 5, 2020, when  after she was shot in the face with a tear gas cannister fired by a police

officer using unrequired and unnecessary force, as part of an effort by the Rochester Police

Department and the Monroe County Sherriff's Office to violently suppress the exercise of  First

Amendment Rights by Ms. Hushla, and thousands of others, protesting the killing of an unarmed

Black man by Rochester Police.

2.       On September 2, 2020—following the public release of body camera footage

showing Black Rochester resident Daniel Prude handcuffed, mocked, covered in a hood, and

pressed into the street by Rochester Police Department officers – actions which ultimately

resulted in the death of Mr. Prude—thousands of Rochester citizens participated in peaceful

rallies and marches over several days to protest the killing of Mr. Prude, racial injustice, and

police brutality against Black people in Rochester and across this country, including the police

killings of George Floyd in Minnesota and Breonna Taylor in Kentucky..

3.       Ms. Hushla, a legislative aide, participated in these protests on September 4, 2020

and  September 5, 2020, during which time officers of various ranks (from the Rochester Police

Department, the Monroe County Sheriff's Office, and the State of New York) repeatedly and

without justification used pepper spray, gas, other chemical weaponry, flash grenades, and other

forms of unnecessary physical force against peaceful protesters, including Plaintiff, in the City of Rochester—many of whom were never charged with any crime and were merely peacefully exercising their First Amendment Rights.

4.      As a result of these actions Ms. Hushla inhaled smoke and tear gas

5.      Ms. Hushla was shot in the face as she was leaving the Rochester protests on September 5, 2020, far from the epicenter and away from any crowd, as a result of either being intentionally targeted by a law enforcement officer, or hit negligently because the police officer, standing further from the demonstration than Ms. Hushla.  utilized unreasonable and unnecessary force against Ms. Hushla and others who had exited the demonstration. .

6.      The unnecessary, excessive,  and unreasonable use of force as a  policing practice at demonstrations involving the exercise of First Amendment rights in and around Rochester are part of a policy and practice of the Rochester Police Department (RPD) and the Monroe County Sheriff's Office. This misconduct is widely documented in prior lawsuits, complaints, videos, and reports, as well as subsequent statements by law enforcement officials.

7.      Ms. Hushla brings this action, in part, under 42 USC § 1983, and in part under NY State tort law, because officers, acting under color of law, but in excess of that authority, acted  to retaliate against her—by use of wholly unnecessary and excessive force—because she had exercised First Amendment Rights secured by the Constitution of the United States.

8.      Moreover, she brings this action, in part, to hold the Rochester Police Department and the Monroe County Sherriff's Office accountable for attacking her as part of the reckless dispatch dozens of overly-armed, inadequately trained officers and deputy sheriffs, using, inter alia,  military style weapons to subdue largely peaceful  protests challenging police mis-conduct, which use resulted predictable  indiscriminatly violent, excessive force, against peaceful

protestors s—including the firing of a tear gas cannister, at a lone woman, Ms. Hushla, walking towards her car, away from the demonstration.

## PARTIES

9.      Plaintiff NICOLE HUSHLA is a resident of the City of Penfield, County of Monroe, State of New York. Ms. Hushla was a long-time legislative aide, Member of the Irondequoit Town Council, and Vice-Chair of the Monroe County Democratic Party.

10.      The Defendant CITY OF ROCHESTER (also, herein, the "City" or "Rochester") is a municipal entity created under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance  and actions of its police force.

11.      Defendants "JOHN DOE POLICE OFFICERS 1-200" (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD, under the direction of the City and the RPD, and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as the "RPD Officers" or individually as "Officer."

12.      Defendant TODD BAXTER ('Sheriff Baxter" or "Baxter") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his official capacity as Sherriff. BAXTER is responsible for the training, supervision, and discipline of the Defendant Sheriff's Deputies.

13.     Defendants "RICHARD ROE MONROE COUNTY SHERIFF'S DEPUTIES 1-200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sherriff's Office. ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and pursuant to Sheriff BAXTER's direction, and were acting under color of state law, but in excess of that authority. They are sued in their individual capacities. They are collectively referred to as "the Sheriff's Deputies" or individually as ""Deputy."

## JURISIDICTION

14.     This Court's jurisdiction is invoked pursuant to 42 USC Section 1983. This Court's supplemental jurisdiction under pendent state law is invoked pursuant to 28 USC Section 1338.

## STATEMENT OF FACTS

### A.     The Death of Daniel Prude

15.     On March 23, 2020, Daniel Prude suffered an acute mental health crisis. Daniel's family called the Rochester Police Department ("RPD") multiple times for help. Those calls ended in the brutal killing of Daniel by RPD officers—a tragedy that shocked the City of Rochester and the nation.

16.     The RPD officers approached Daniel on a street in southwest Rochester. He was naked and bleeding and clearly mentally unwell. But upon seeing the officers, Daniel immediately lay down, saying "yes sir" repeatedly and offering no resistance.

17.     The officers ordered Daniel to place his hands behind his back. He complied. They handcuffed him as he shouted, "In Jesus Christ I pray, amen," among various other

comments. The officers mocked Daniel and chatted among themselves as he lay handcuffed, naked, in the cold.

18.     They then covered his head in a "spit hood."

19.     As Daniel struggled under the hood, unable to breathe, the officers pushed his face into the freezing asphalt, knee into his back, until his breathing and heartbeat ceased, and he lay motionless in street.

20.     Eventually, the officers transported the almost lifeless—but still handcuffed—Daniel to Strong Medical Hospital, where attempts were made to revive him.

21.     Daniel was declared braindead that night. One week later, on March 30, 2020, at 8:33 pm, Daniel was disconnected from life support and declared dead. He was 41 years old.

**B.     Rochester authorities attempt cover-up of Daniel's death**

22.     On April 10, 2020, the Medical Examiner's office ruled Daniel's death a homicide, citing "complications of asphyxia in the setting of physical restraint." The Medical Examiner also cited delirium and "excited delirium and acute intoxication by phencyclidine, or PCP" as possible contributing factors.

23.     Rochester Police Chief La'Ron Singletary, however, only told the city's communications director that Daniel's cause of death was a drug overdose and resisting arrest. Chief Singletary never mentioned "complications of asphyxia in the setting of physical restraint." He never mentioned the spit hood.

24.     On April 16, 2020, the Monroe County District Attorney, Sandra Doorley, contacted the New York State Attorney General's Office—as required under a 2015 executive order by Gov. Cuomo related to in-custody deaths—to notify the Attorney General of Daniel's death in custody.

25.     After reviewing the case, the Attorney General's office launched an investigation. Neither Governor Andrew Cuomo's office, Attorney General Letitia James. nor Rochester officials made any public comments regarding the investigation. Most of the City of Rochester was still unaware of Daniel's death or the circumstances that led to it for months to come.

26.     On May 25, 2020, police officers in Minnesota murdered George Floyd—and unarmed man, like Daniel, by asphyxiation after kneeling on his neck and pressing his face into the street. The shocking video of Mr. Floyd's murder triggered outrage and protests across the United States, including across Rochester and Western New York.

27.     On June 12, 2020, the New York State Attorney General's office offered the Prude family an opportunity to watch the body camera footage of Daniel's arrest and disclosed the names of the officers involved. The family was justifiably horrified.

28.     On July 15, 2020, New York State Governor Andrew Cuomo signed an order officially granting the New York State Attorney General authority to investigate and, if warranted, prosecute law enforcement officers connected to Prude's death.

29.     Cuomo's order was pro forma. The state had begun its investigation three months earlier. But the order provided another acknowledgement of the probe regarding Daniel's death. Yet at no point did Governor Cuomo's office, Attorney General James' office, or any Rochester officials announce in a news release or otherwise the investigation of Daniel's death.

30.     Still, Rochester officials begin to prepare for the possible spread of the news. On July 15, 2020—the same day Governor Cuomo signed the order granting Attorney General James the authority to investigate—Rochester Mayor Lovely Warren issued an executive order banning gatherings of five or more people between 11 p.m. and 5 a.m. Mayor Warren cited a spike in shootings as the reason for the order, along with concern over the spread of COVID-19.

31.     As rumors of Daniel Prude's death (and the video shown to Daniel Prude's family) began circulating, however, some questioned whether the Mayor's order was really more closely related to the ongoing protests regarding police brutality and racial discrimination and a fear that news of Daniel's death—and the video should it become widely viewed—would lead to intensified protests and demands for change and accountability in Rochester, protests which she wanted to make unlawful in advance.

32.     On August 12, 2020, the City of Rochester finally provided the body camera footage to Daniel Prude's family. Seemingly unaware that the video had been handed over, RPD Capt. Frank Umbrino emailed two colleagues about a meeting with Chief Singletary in which they discussed the case and the timing of the release of the video. Umbrino stated, "The feeling from 6th floor [the Chief] is the longer it takes, the better it is."

33.     On Wednesday, September 2, 2020, Prude's family members, lawyers, and activists held a news conference where they released the video showing Daniel mocked by officers, covered in a hood, and suffocating in the street.

**C.      Public Outrage Upon Release of the Tape of Daniel Prude's Arrest and Death**

34.     With the tape released, officials could no longer contain the story of Daniel Prude's death.

35.     The public, in Rochester and around the United States, was largely shocked and outraged by the video. Protests in Rochester, involving hundreds of people begin at two locations: the Public Safety Building in Downtown Rochester and Dr. Samuel McCree Way, which is near where Daniel Prude was arrested in Southwest Rochester.

36.     The demonstrations were largely peaceful. Most protestors came to chant, pray, and listen to music.

37.     Protestors called for the officers involved in Prude's death to be investigated and charged. At the September 2, 2020 protest, Free the People ROC (one of the main organizers of the protests) representative Ashley Gantt stated a popular sentiment among the demonstrators, "If one of us committed a murder, it would've been on the news that night . . . They could've released a statement saying someone died in police custody or while trying to be apprehended by police, but they said nothing. It took us six months just to get the body cam footage." The protest that day was entirely peaceful, and the police did not interfere.

38.     On Thursday, September 3, 2020, in response to the public outrage, Rochester Mayor Lovely Warren held her own press conference. In it she claimed that Chief Singletary initially lied to her by telling her that Daniel Prude died from an apparent drug overdose. She also claimed that she did not see what she described as the "disturbing video" showing Daniel Prude's death until August 4, 2020.

39.     Further, Mayor Warren said that she was "enraged" after seeing the video but did not make it public because she did not want to interrupt the State Attorney General's investigation. She also announced that the Rochester Police Department had suspended the seven officers involved with pay and began its own investigation. In other words, they had continued working until that day.

40.     A report commissioned by City lawmakers later, however, found that Warren knew on the day of Prude's deadly arrest on March 23, 2020, that he suffocated after the officers placed him in a hood and pressed him into the street. The report also confirmed that Rochester officials worked hard to keep details of Daniel Prude's's death secret, citing Captain Umbrino's emails among other evidence.

41.     Further indicating evidence of efforts by officials to hide news of Daniel Prude's death, on September 3, 2020 (the same day of Mayor Warren's press conference), City Council President Loretta Scott told news networks that two weeks prior Mayor Warren had "mentioned we had a notice of claim from someone, the family of someone who had died in custody who had been high on PCP." Scott also said she was told by the Mayor that the matter was "confidential."

**D.     Police forces attack a peaceful protests in Rochester**

42.     Mayor Warren's September 3, 2020 press conference did little to address public concerns. Later that day, she attended a meeting with community stakeholders to address the unfolding crisis. The meeting was also attended by Chief Singletary and several members of City Council and organized by the United Christian Leadership Ministry, led by the Rev. Lewis Stewart. Several protestors interrupted the meeting.

43.     This meeting was just hours after Warren publicly reprimanded Singletary at her press conference. At the United Christian Leadership Ministry meeting, in response to the protestors, Warren called Singletary and the other police leaders with him "killers" and demanded he leave, which he did, clearly upset.

44.     That evening, protests grew at a memorial to Daniel Prude which has been erected on Jefferson Ave in Rochester. Hundreds lay face down on the street while music played. The demonstrators then marched towards the Public Safety Building (the nerve center for the RPD). Despite the general peaceful nature of the protests, the RPD responded with force late into the night, shooting pepper spray and pepper balls at the protestors, and driving them away from the Public Safety Building. Eight demonstrators were arrested.

45.     On Friday, September 4, 2020, the protests grew. Approximately 1,000 peoplegathered in Martin Luther King Jr. Memorial Park, where they again chanted, prayed, and

listened to music and speeches. Later, the protesters marched throughout the city chanting, "Black Lives Matter" and carrying signs reading "They knew" and "Silence is Compliance."

46.     Ms. Hushla joined the protests and began livestreaming the events to hundreds of viewers on her mobile phone. In her words, "I wanted the public to see that the protests were peaceful  . . ."

47.     When Ms. Hushla and the other protestors neared the Public Safety Building again (on the Broad Street Bridge), they were met with anything other than public safety. They were met with military-level force, with RPD, Sheeriff's Officers and other law enforcement more armed, and using greater force  than the night before. Police in riot gear were positioned behind metal barriers and perched at strategic locations around the bridge. Police drones hovered over the crowd.

48.     Upon seeing the marching protestors, law enforcement immediately announced on loudspeakers that the protest is an "unlawful assembly" and ordered the crowd to disperse. The officers, including members of the RPD and the Sherriff's Office, however, gave the protestors no time to exit the bridge and immediately began to indiscriminately fire pepper balls and tear gas at them at positions all over the bridge. The peaceful, chanting crowd including many children, elderly people, and even citizens in wheelchairs, was in place on the bridge, Again, these events were widely documented by mobile phone cameras, including Ms. Hushla's own camera. The City,  Baxter sent RPD Officers and Sheriffs there, with no advance training, but armed with tear gas, pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, and flash-bang grenades and other "non-lethal munitions, into battle with the protesters, acting as though the protesters were enemy combatants.

49.     It was widely reported that as a result of the RPD Officers' and Sheriffs' actions numerous protesters sustained injuries, even though only 11 people were arrested.

50.     Saturday, September 5, 2020, despite (and maybe because of) the increasingly hostile tactics by police, the protests grew. Several elected officials joined the protestors, including City Council members Mary Lupien and Mitch Gruber, as well as Plaintiff Hushla.

51.     Despite the harrowing moments from the previous night, Ms. Hushla joined again, determined not to allow the police to intimidate her from exercising her Constitutional rights. Ms. Hushla intentionally avoided the frontlines of the protest in case the police were again recklessly violent. Given the events of the previous day, many protestors came with carboard shields, face coverings and helmets.

52.     The protests begin peacefully at Rochester City Hall. The protestors then marched throughout the City without significant incident with or provocation from the police. The protestors continued to sing, pray, and chant.

53.     Upon nearing the Public Safety Building, at Broad Street and Exchange Place, however, the protestors were again surrounded by City, county and State police officers, again armed with military grade weapons, plus police dogs, and even an armored tank like vehicle called a "bear cat."

54.     At approximately 10:25 PM, like the night before, the RPD Officers and Sheriffs declared via loudspeaker that the gathering was "unlawful," and ordered the protesters to disburse. And again, without barely a pause, as documented by video, the RPD and Sherriff's Officer, along with NY State Troopers, unleashed a flurry of pepper balls, flash grenades, and tear gas into the crowd of unarmed citizens, including the elected officials. Nine people were arrested.

55.     Monroe County Legislator Rachel Barnhart said, accurately, of the moment, "We gathered on Jefferson Ave., where Daniel Prude was killed. More than 1,000 people chanted, sang, and marched peacefully up Jefferson Ave., down Main St. and to City Hall before heading to the Public Safety Building . . .We were greeted by a massive police presence. We were immediately told our assembly was unlawful and to go home . . . Councilmembers Mary Lupien, Mitch Gruber and I were at the front of the line. We wanted police to see our faces. We hoped they would hold off on attacking protesters seeing elected officials who bore witness . . . there was no danger until a militaristic police force blocked our way . . . Many of the protesters wore goggles and bike helmets, and prepared to use Rubbermaid lids as shields. It felt like they were getting ready to meet an army . . . " The protestors didn't wear helmets and shields because they wanted to attack the RPD Officers and Sheriffs, but because they wanted to protect themselves from a potential assault by the police.

56.     As a result of the attack by the RPD and Sherriff's Officers Plaintiff Hushla inhaled noxious and painful gases, and was terrified by the projectiles , some of which exploded, landing around her.

**E.**     **Ms. Hushla is shot in the face as she walks to her car**

57.     As the police attacks intensified, Ms. Hushla began to feel increasingly that indeed her safety was in jeopardy. She was coughing, her eyes burning from tear gas, and she outraged by the aggressive police actions, which she described on her livestream as a "scene from Les Miserables." Plaintiff Hushla attempted to continue her documentation of the violence by law enforcement, but after a flash-bang grenade exploded just feet from where she was standing, she decided that she had no choice but to leave.

58.     At approximately 11:00 p.m., she turned away from the protests, walking back to her car, videotaping others walking down the street. Ms. Hushla's car was parked on State Street,

north of the intersection on Main Street, near a bar called the Spirit Room, just south of the

Holiday Inn—about a third of a mile from where the police confrontation with the protesters was

occurring.

59.     As she was approaching her car, at or about 11:15 PM, Ms. Hushla was shot in

the face with a tear gas cannister fired by an RPD Officer or a Sheriff. Upon information and

belief the RPD Officer or Sherriff fired the tear gas cannister from a position 100-300 feet further

north from the demonstration than where she was. In other words, she was between the person

who fired the tear gas grenade and the site of the protest. She was nowhere near a crowd,

walking away from and facing away from where the protester -police confrontation was

occurring, not engaged in any unlawful activity, or in any way posing a threat to the police or

anyone else in any conceivable way. The tear gas weapon which was fired was not designed to

be fired at or near the heads of civilians, clearly indicating either a lack of training, and or a plan

to injure her or a negligent effort to intimidate or punish those, like her, who had been engaged in

protesting as they left the site of the protest.

60.     The RPD Officer or Sheriff who shot the tear gas cannister did not shout any

warning, either to stop, or that they was about to fire their weapon. The actions of the RPD

Officer or Sheriff who shot her indicated either  a deliberate intent to cause Plaintiff serious

bodily injury despite the fact that she posed no danger to the Officer's/Sheriff's well-being, or a

grossly negligent, and excessively inappropriate and forceful effort to terrorize Ms. Hushla and

or those who were leaving the protest..

61.     The RPD Officer or Sheriff who shot the grenade at Ms. Hushla lacked cause of

legal justification for shooting at or near Ms. Hushla with weapon which launched a tear gas

cannister.

62.    Ms. Hushla's face was permanently scarred from the attack and the inhaling of chemical weapons, some of which were expired and not fit for use on human targets. The attacked caused a permanently deviated septum that impacts her breathing and may worsen with time, dramatic changes to her menstruation cycle, other internal damage, and emotional pain that she continues to seek professional help for (diagnosed as PTSD). She has been required to take, long-term,  prescription anti-anxiety medication to cope with the emotional trauma, which has dramatically affected both her personal and professional life.

63.    Pictures of Ms. Hushla's damaged and bloody faced covered newspapers and social media for days and months to come, as she was repeatedly mocked and harassed by those unsympathetic with the protests. After threats to her physical well-being, she was forced to relocate, leaving her hometown where she lived her entire life and served as a Town Councilwoman for four years, to avoid the stalking and harassment.

64.    Ms. Hushla did nothing unlawful, or imminently unlawful, prior to being attacked. She was there as an American citizen, lawfully expressing her views, yet violently attacked on the street for demanding justice for another American citizen who had been violently attacked on the street.

**F.    The RPD's and Sheriff Baxter's failure to properly train, supervise, or discipline offers and recklessly sending these untrained officers to attack peaceful protestors led to Ms. Hushla's injuries**

65.    Upon information or belief, neither the Monroe County Sheriff's Department nor the RPD trains its officers to respect or preserve core First, Fourth, or Fourteenth Amendment rights guaranteed by the United States Constitution for First Amendment assemblies. Instead, these agencies train or allow their officers and sheriffs to focus on crowd suppression and intimidation, and treat all protests, no matter how peaceful,  as "civil disturbances" that must be suppressed by force, because they that can quickly unravel into chaos and mayhem.

66.     Monroe County Sherriff Baxter's has used these precise words—"civil disturbances," "mobs," and "riots"—to characterize lawful First Amendment activities, including the September, 2020 protests, which were overwhelmingly peaceful, as documented by thousands of hours of video.

67.     The RPD uses what it calls as the "Mobile Field Force" ("MFF)" to manage peaceful protests, which it describes on its website as, ". . . a specially trained and equipped team providing a rapid, organized, and disciplined response to civil disorder, crowd control or other tactical situations."

68.     Upon information and belief, the MFF's training guidelines treat "disorders" as military engagements, not public safety operations. Hence, the MFF's training is designed to deter, disperse, and demoralize groups of protestors through the use of chemical weapons, flash grenades, wand what is known as "kettling" (i.e., targeting protesters who are  leaving protests to intimidate them) and other militaristic maneuvers unfit for a peaceful protest on a public street. The "civil disorder" training given to the MFF are not designed for policing of lawful First Amendment protected assemblies and demonstrations; they are designed for handling large-scale civil disorders such as riots.

69.     Upon information and belief, there is virtually no RPD training, and certainly, no meaningful RPD training, focusing on how to utilize the tactics described in the MMF's "civil disorder" training and guidelines the without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

70.     Many MFF members have histories of engaging in the kinds of misconduct

complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

71.     Upon information and belief, the MFF was the RPD's primary unit tasked with policing the peaceful protests after the death of George Floyd, and the announcement of how Daniel Prude died, in May and September 2020, and in this case, during the evenings of September 4 and 5, 2020.

72.     Examples of RPD's pre-September 2020 unreasonable, excessive and free-speech deterrent use of force during pre-2020 lawful protests include:

a) In October 2009, an anti-war protest in Rochester resulted in several RPD-protester physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

b) In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality was a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

c) In July 2016, in Rochester as across the nation, protests occurred to uphold the sanctity of Black lives, using the slogan "Black Lives Matter" (BLM), and with a call for an end to racist policing. In response, the RPD targeted Black protesters with unlawful force, including Black journalists. Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and both identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

73.     Despite the wealth of evidence of RPD officers' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing, and improve that training, or RPD's approach to large demonstrations..

74.     In fact, following the above-described protest in 2016, the RPD and Mayor Warren stated that the police handled themselves appropriately.

75.     When questioned by public officials, then RPD Police Chief La Ron Singletary stated that in developing his plan to respond to protests in 2020, he did not review RPD's much criticized actions in 2016.

76.     The RPD's exclusive focus on deterring, dispersing and demoralizing demonstrators, in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate peaceful protests, despite having received clear notice that RPD policing of protests has caused systemic violations of protesters' constitutional rights for years, demonstrates that the

City has an intentional policy  to stifle protesters' rights under the First  and Fourteenth Amendments.

77.     Similarly, the Monroe County Sheriff Department takes a similar approach to large First Amendment protected assemblies., Defendant Baxter, has stated that he considers all peaceful protests to be potential threats, stating in its that ". . . any protests intended to peaceful demonstrations to the public and government can escalate into general chaos . ."

78.     Prior to September 2020, BAXTER had clear notice, that without proper training his Deputies were likely to violate the Constitutional rights of peaceful demonstrators in Monroe County. rights of that peaceful

79.     Nevertheless, Baxter, upon information and belief, took no steps to train his Sherriff's Deputies how to lawfully police peaceful protests without violating demonstrators' Constitutional right. Instead, like the Rochester Police Department, Sheriff's Deputies we sent to demonstration armed as though they were facing a riot, with military style equipment, ready to respond to what they perceived as the slightest provocation with massive force.

80.      Instead, Baxter, pursuant to County policy, trains his Sheriff's Deputies that a "civil disturbance," is defined as both a "peaceful demonstration or acts of violence."

81.     In other words,  Baxter has created  County policy which explicitly conflates peaceful protests with violent riots.

82.     Upon information and belief, BAXTER does not provide any training to his Sheriff's Deputies about how to draw distinctions between peaceful protest and a "violent mob."

83.     Instead, County policy is that many protests intended to be peaceful demonstrations to the public and the government can escalate into chaos."

19

84.     Like RPD, the Monroe County Sheriff trains Deputies exclusively in deterring, disbursing and demoralizing protests and peaceful demonstration.

85.     According to County policy, peaceful demonstrates are discouraged because of the perceived negative impacts on property resources, real estate, and the economy; again, this is a result of Baxter.

86.     In June 2020, several Monroe County Legislators called on Baxter to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and Baxter in which they made a number of requests related to public safety and the safety of protesters, and concluded, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place for the mutual safety of all."

87.     Instead of focusing on ways to improve training, Sheriff Baxter called the letter a "political stunt" and refused to provide any details on how he would change training to ensure the safety of Black Lives Matter protestors.

88.     Baxter's flawed training and similar inaction by the Rochester Police Department directly led to Ms. Hushla's injuries, both at the protests that she attended, and when she was shot in the face..

## FIRST CAUSE OF ACTION

### First Amendment Infringements, Including First Amendment Retaliation
### Pursuant to 42 U.S.C. § 1983

89.     Plaintiff was attacked, at the demonstration, and as she approached her car, because she was, or had been exercising her First Amendment right to protest, because she had

been at the demonstration described above, because she was broadcasting a livestream video about what was going on, and, upon information and belief, because she was recognized as an outspoken public leader who had expressed support for the demonstrators and their goals.

90.     The Defendants who attacked Plaintiff at the demonstration on September 5, 2020, and the Officer of Deputy who fired the grenade at her, acted under color of state law , but in excess of that authority, to deprive Plaintiff of rights protected by the First Amendment to the United States Constitution.

91.     The attacks reflected a policy of Defendants City and Baxter, making them liable under *Monell v. Department of Social Services of the City of New York*.

92.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CAUSE OF ACTION

**Excessive Force in Violation of the 14th Amendment  Pursuant to 42 U.S.C. § 1983**

93.     The RPD Officers and Sheriffs' Deputies who launched a military style attack on the demonstration Plaintiff was at on September 5, 2020 acted with excessive force, in violation of the 14th Amendment to the US Constitution in that their actions were objectively unreasonable in light of the facts and circumstances confronting them.

94.     The Officers or Deputy who shot a grenade which struck Plaintiff on September 5, 2020, acted with excessive force, in violation of the 14th Amendment to the US Constitution in that his or her action was objectively unreasonable in light of the facts and circumstances facing him or her.

95.     The Officer or Deputy who fired the grenade which struck Plaintiff on September 5, 2020, acted under color of state law, but in excess of that authority.

96.     The unlawful conduct of said defendant was willful, malicious, and reckless, and was of such nature that punitive damages should be assessed against him or her.

97.     The attacks reflected a policy of Defendants City and Baxter, making them liable under *Monell v. Department of Social Services of the City of New York.*

### THIRD CAUSE OF ACTION
**Assault**

98.     As the RPD Officers and Sheriff's Deputies who began firing tear gas, pepper spray, military style projectiles, and flash bombs caused Plaintiff to suffer a reasonable apprehension of imminent harm.

99.     The Officer and or Deputy who fired the grenade at Plaintiff, as he or she shot the grenade into the air, caused Plaintiff, as she watched the grenade come towards her, to suffer a reasonable apprehension of imminent harm.

### FOURTH CAUSE OF ACTION
**Battery**

100.    The RPD Officers and Sheriff's Deputies who fired tear gas and pepper spray and other projectiles at plaintiff made contact with Plaintiff's body, causing her injury, and had the intent of causing such injury..

101.    The Officer or  Deputy who fired the grenade which struck Plaintiff intended to and did make contact with Plaintiff's body, causing her injury.

### FIFTH CAUSE OF ACTION
**Negligence**

102.    The Officer or  Deputy who fired the grenade had a duty to Plaintiff to utilize their weapon in a manner which would not cause physical contact with pedestrians or any other

persons. But instead utilized it negligently, in a manner which resulted in Plaintiffs being struck, causing her injury.

## **DAMAGES**

103.   Plaintiff has suffered severe and continuing physical injury to her damage in the sum of $5 million.

104.   Plaintiff has suffered severe and continuing emotional distress to her injury in the sum of $5 million.

105.   Defendants acted willfully, maliciously, and /or recklessly in causing injury to Plaintiff, entitling Plaintiff to an award of punitive damages.

106.   The RPD Officers, and Sheriff Deputies who engaged in the aforedescribed tortious conduct, were at all relevant times employees and agents of the Defendant City and Baxter. Each of those defendants and persons was acting within the scope of their employment, and their acts and omissions, as alleged above, are therefore directly chargeable to the City and/ Baxter, under the doctrine of respondeat superior.

107.   The injuries suffered by Plaintiff arose out of the policies of Defendants City and Baxter described above, making the City and Baxter liable for the Constitutional deprivations described above, under Monell v. Department of Social Services of the City of New York.

## **JURY TRIAL DEMANDED**

108.     Plaintiff demands a jury trial on all claims herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment for Plaintiff:

a.     Awarding compensatory damages, jointly and severally against Defendants, for physical injury arising from the Constitutionally excessive force, assault and battery in the sum of $5 million;

b.     Awarding compensatory damages, jointly and severally against Defendants, for emotional distress arising from the Constitutionally excessive force and assault and battery in the sum of $5 million.

c.     Awarding punitive damages against each Defendant City of Rochester and Sheriff Baxter in the sum of $10 million;

d.     Awarding attorney's fees pursuant to 42 U.S.C. § 1988; and

e.     Granting such  other and further relief as the court may deem just and proper.

Dated: New York, New York
       June 24, 2022

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS

By: /s/  Arthur Z. Schwartz
     Arthur Z. Schwartz

By: /s/ Nathan McMurray
     Nathan McMurray
     225 Broadway, Suite 1902
     New York, New York 10007
     (212) 285-1400
     aschwartz@afjlaw.com
     nmcmurray@advocatesny.com

THE ABOUSHI LAW FIRM

By: /s/  *Tahanie Aboushi*
    Tahanie Aboushi
    1441 Broadway, 5th Floor
    New York, New York 10018
    (212) 391-8500
    tahanie@aboushi.com

*Attorneys for Plaintiff*